## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DAKOTA HANLEY**                                          **CIVIL ACTION**

**VERSUS**                                                         **NO. 22-258**

**ILLINOIS CENTRAL**
**RAILROAD COMPANY**                            **SECTION: "H"**

### ORDER AND REASONS

Before the Court is Defendant's Motion for Summary Judgment (Doc. 23). For the following reasons, the Motion is **GRANTED**.

### BACKGROUND

This action arises out of personal injuries that Plaintiff Dakota Hanley suffered while working as a construction laborer to replace Bridge 891.50 at the Bonnet Carre Spillway, located near LaPlace, Louisiana (the "Spillway Project"). Plaintiff was hired by OCCI, Inc. (OCCI) in February 2016 as a construction laborer. In February 2017, Defendant Illinois Central Railroad Company (ICRC) contracted with OCCI to complete the Spillway Project ("the OCCI–ICRC Agreement"),[1] on which Plaintiff was assigned to work from February 2017 until the time of his injury in June 2019.

Defendant operates a rail line known as the McComb Subdivision, which runs from Harahan, Louisiana, through Kenner, and across the south of Lake Pontchartrain. The rail line crosses the terminus of the Bonnet Carre Spillway

---

[1] Doc. 23-2; Doc. 26-3.

at Lake Pontchartrain, resulting in a portion of the rail line elevated on a bridge. The object of the OCCI–ICRC Agreement was to build a new bridge approximately 50 feet adjacent to the existing bridge. The existing railroad track remained open and used by active rail traffic during the Spillway Project.

On June 25, 2019, Defendant Hanley arrived at the laydown yard for his regular morning briefing by ICRC Employee In Charge ("EIC") Gary Durbin. After job safety and risk assessment briefing, Plaintiff separated into his two-man crew, where his OCCI-employed supervisor instructed him of his work for the day—roll up a cable and fix a water tank located on the "bridge builder."[2] While climbing the ladder to reach the water tank, Plaintiff's hand slipped from a ladder rung, causing him to fall approximately seven and a half feet. He injured his right knee and later had two surgeries. After completing medical treatment, Plaintiff returned to work for OCCI on the Spillway Project.

Plaintiff filed this suit for injuries sustained under the Federal Employer's Liability Act (FELA), which provides an avenue of redress for certain injured railroad employees. On August 1, 2023, Defendant moved for summary judgment, alleging that Plaintiff was not an employee of Defendant and is therefore not covered under FELA, thereby precluding Plaintiff's claims against Defendant under the Act. Plaintiff opposes, asserting that he has presented sufficient evidence to show that there is a genuine dispute as to whether he was employed by Defendant at the time of his injury.

---

[2] The "bridge builder" is a custom piece of equipment that was constructed by OCCI employees, including Plaintiff, to assist in completion of the Spillway Project. The "bridge builder" was elevated above the level where new and old track laid, requiring workers to climb a ladder to reach the equipment.

## LEGAL STANDARD

In the FELA context, the Fifth Circuit has held that "a judgment as a matter of law against the plaintiff in a FELA suit is appropriate 'only when there is a complete absence of probative facts' supporting the plaintiff's position."[3] While this plaintiff-friendly standard recognizes the congressional intent to protect the plaintiff's right to a jury trial in FELA cases,[4] the standard does not apply outside of the FELA context. In making the threshold inquiry of whether Plaintiff was an employee of Defendant at the time of his injury— thereby determining whether FELA applies at all—the Court employs the general legal standard applicable to motions for summary judgment.[5]

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[7] Nevertheless, a dispute about a material fact is "genuine" such that summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8]

---

[3] Rivera v. Union Pac. R.R. Co., 378 F.3d 502, 506 (5th Cir. 2004) (citing Wooden v. Mo. Pac. R.R. Co., 862 F.2d 560, 561 (5th Cir. 1989); Davis v. Odeco, Inc., 18 F.3d 1237, 1243 (5th Cir. 1994); Bommarito v. Penrod Drilling Corp., 929 F.2d 186, 188 (5th Cir. 2001)).

[4] Id. (citing Wooden, 862 F.2d at 561).

[5] Compare Wheeler v. Norfolk S. Ry. Co., No. 20-1021, 2020 WL 5909528, at *4–5 (E.D. La. Oct. 6, 2020) (applying the general legal standard under Federal Rule of Civil Procedure 56 to the defendant's motion for summary judgment where the defendant alleged that the plaintiff was not the defendant's employee), with McCormick v. New Orleans Pub. Belt R.R. Comm'n, No. 16-1897, 2017 WL 2267204, at *3 (E.D. La. May 24, 2017) (applying the heightened "complete absence of probative fact" standard to the defendant's motion for summary judgment where the issue on summary judgment was whether the railroad exercised reasonable care).

[6] FED. R. CIV. P. 56.

[7] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[8] Id.

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[9] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[10] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[11]

"In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial."[12] The Court does "not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[13] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[14]

## LAW AND ANALYSIS

Plaintiff asserts his claim for personal injuries under FELA.[15] Section 51 of FELA permits employees of common carriers by railroads to recover

---

[9]  Coleman v. Hous. Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997).

[10] Engstrom v. First Nat'l Bank, 47 F.3d 1459, 1462 (5th Cir. 1995).

[11] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[12] Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[13] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 393–94 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).

[14] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

[15] 45 U.S.C. § 51 *et seq.*

damages for injuries suffered while employed by such common carrier.[16]
However, for the provisions of FELA to apply, a plaintiff must first prove that
he or she was employed by a railroad at the time of injury.[17] Common law
principles govern the issue of employment and require more than a mere
agency relationship.[18] "[U]nder the FELA, a worker can be the 'employee' of a
railroad even though carried on the employment rolls of another company and
paid by that other company."[19]

Generally, a plaintiff may establish that he or she is the employee of a
railroad by proving his or her status as: (1) the railroad's borrowed servant, (2)
serving two employers simultaneously, or (3) a subservant of a company that
serves the railroad.[20] "Under each of those doctrines, a worker's employment
status turns on 'whether the railroad has control of the employee or the right
to control the employee.'"[21] In other words, the railroad must control the
manner and details of the employee's work.[22] While a railroad need not have
full supervisory control over the alleged employee, the plaintiff must
demonstrate that the railroad plays a "*significant* supervisory role" in his or
her work.[23] Affirmative control over the alleged employee is necessary to find
sufficient supervisory power that brings Plaintiff within FELA's provisions.[24]

---

[16] *Id.* § 51.

[17] *Id.* ("Every common carrier by railroad while engaging in commerce between any of the
several States or Territories . . . shall be liable in damages to any person suffering injury
while he is employed by such carrier in commerce . . . ."); *see also* Wheeler v. Norfolk S. Ry.
Co., 6 F.4th 626, 630 (5th Cir. 2021).

[18] Kelley v. S. Pac. Co., 419 U.S. 318, 323 (1974).

[19] Lindsey v. Louisville & Nashville R.R. Co., 775 F.2d 1322, 1324 (5th Cir. 1985).

[20] *Kelley*, 419 U.S. at 324 (1974).

[21] Wheeler v. Norfolk S. Ry. Co., 6 F.4th 626, 630 (5th Cir. 2021) (quoting *Lindsey*, 775 F.2d
at 1324).

[22] *Id.* at 630–31 (citing *Kelley*, 419 U.S. at 325).

[23] *Lindsey*, 775 F.2d at 1324 (citing *Kelley*, 419 U.S. at 327) (emphasis added).

[24] *Wheeler*, 6 F.4th at 631 (finding that stop work authority is a "far cry from the directive
control" required by the Supreme Court in *Baker*).

5

Plaintiff asserts that he is an employee of Defendant under two alternative theories—as a simultaneous servant of both OCCI and ICRC, or as a subservant of OCCI serving ICRC.[25] The test for both theories of employment turns on whether Defendant had control or a right to control Plaintiff at the time of injury. Thus, the Court need not evaluate each theory separately and now considers Defendant's and Plaintiff's arguments in turn.

### 1. *Defendant-Movant's Arguments*

As movant, Defendant has the initial burden of showing that there is no genuine issue of material fact. Defendant ultimately cites to two sources demonstrating an absence of control or a right to control Plaintiff: (1) the OCCI–ICRC Agreement, and (2) employee testimony and declarations.

### A. *The OCCI–ICRC Agreement*

First, Defendant outlines the OCCI–ICRC Agreement's allocation of supervisory authority to OCCI over the Spillway Project laborers. OCCI was required to "furnish all material, supervision, labor, equipment, tools, supplies, incidentals, and transportation."[26] ICRC was responsible for paying OCCI a lump sum agreed upon by the parties for work completed, while OCCI was responsible for paying "all bills for labor and material performed and furnished by others in connection with the performance of the Work."[27] The OCCI–ICRC Agreement also required that OCCI handle all "details of the Work, the personnel of the workers and the hours during which the Work is to be performed, provided, however, that the Work shall be done by [OCCI] in a safe, efficient and workmanlike manner . . . ."[28] The Agreement expressly required

---

[25] Doc. 26 at 13.
[26] Doc. 23-2 at 1.
[27] *Id.* at 2–3.
[28] *Id.* at 5.

OCCI supervision of work at all times by a competent superintendent.[29] While the Court finds that the OCCI–ICRC Agreement allocates a right of control to OCCI, this does not end the Court's inquiry, as OCCI's mere reservation of authority in the Agreement does not, in fact, preclude ICRC from exercising supervisory control which would render it Plaintiff's employer.[30]

### B. Employee Testimony and Declarations

Second, Defendant offers employee testimony and declarations of OCCI and ICRC employees to demonstrate OCCI's actual, daily exercise of exclusive authority over Plaintiff. For example, Human Resources Specialist for OCCI during the Spillway Project, Mallory Hatch, stated that OCCI selected and assigned laborers to the Spillway Project, and OCCI was required to train those laborers. Thus, it was OCCI's responsibility "to provide a sufficient workforce, not a specific workforce."[31]

Additionally, Hatch stated that daily training and direction of employees was entirely given by OCCI foremen and superintendents. In his deposition, Plaintiff Hanley explained that every day, the OCCI "foreman would tell us what needed to be done . . . and we'd go and do it."[32] Eric Fehling, Plaintiff's foreman for most of the Spillway Project, testified that he gave Plaintiff his shift schedules and daily job assignments, including the assignment that resulted in Plaintiff's injury. In his declaration, Fehling states that "Illinois Central employees, including its EICs, did not control the types of work, job

---

[29] *Id.* at 6.
[30] *See Lindsey*, 775 F.2d at 1324. The Fifth Circuit has held that employment exists where "the railroad has control of the employee *or* the right to control the employee." *Id.* (emphasis added).
[31] *See Wheeler*, 6 F.4th at 631.
[32] Doc. 23-1 at 13.

tasks, manner in which to complete the work, or means to accomplish the work for OCCI laborers including Mr. Hanley."[33]

Plaintiff also testified that he could approach the OCCI foreman or superintendent with questions related to task assignments.[34] Plaintiff stated that he and his fellow OCCI construction laborers discussed amongst themselves how the assigned tasks needed to be done.[35] Thus, OCCI—not ICRC—employees told laborers "what [they] wanted done and *how to do it*."[36]

When asked in his deposition, ICRC EIC Kenneth McGowen agreed that, as EIC, he did not perform any supervision or otherwise communicate with OCCI foremen about the way they built the bridge.[37] McGowen further stated that his sole duty as the EIC on site was "to protect [the construction laborers] from trains and equipment and men coming into the area."[38] Ray Baker, the Vice President and Senior Manager of Engineering at ICRC, corroborated the EIC's role in construction, testifying that, "The EIC does not control the work that occurs within the job site." Rather, Baker states, it was "OCCI's responsibility . . . to develop the means and measures to . . . reconstruct the bridge."[39]

Additionally, OCCI reserved the right to terminate and reprimand its employees. While the OCCI–ICRC Agreement provided ICRC with authority to require OCCI to terminate an employee, Plaintiff does not allege a single instance where this authority was invoked. Additionally, this power of termination is not the type of "directive control over the details of the job

---

[33] Doc. 23-6 at 2–3.
[34] *See id*. at 12.
[35] *Id*.
[36] *Wheeler*, 6 F.4th at 631 (quoting Collins v. Union Pac. R.R. Co., 143 Cal. App. 4th 867, 880 (2012)) (alteration in original) (emphasis in original).
[37] Doc. 23-7 at 5.
[38] *Id*.
[39] Doc. 23-1 at 16.

performed by the individual workmen," which is required for a finding of employment.[40] "[A] contractual provision giving the railroad the right to demand the removal of a contractor employee 'did not give [the railroad] the right to terminate the plaintiff's employment with [the contractor]' and 'does not weigh in favor of an employment relationship between plaintiff' and the railroad."[41]

The testimony and declarations demonstrate an absence of control exercised by Defendant over OCCI employees, such as Plaintiff. Thus, this Court finds that Defendant has met its initial burden of showing the absence of a genuine issue of material fact as to whether Plaintiff was employed by Defendant. The burden shifts to Plaintiff to demonstrate the existence of an issue as to Plaintiff's employment status.

### 2. *Plaintiff-Nonmovant's Arguments*

To demonstrate the affirmative control that Defendant ICRC had over him, Plaintiff offers four sources of such control: (1) stop work authority, (2) track protection, (3) daily job briefings and Risk Assessment Forms, and (4) communications by Ray Baker, Vice President of ICRC.

### A. *Stop Work Authority*

First, Plaintiff asserts that ICRC's "ultimate supervisory control" is its exercise of "stop work authority," which is the authority to order that all work cease if an EIC "saw something being done in an unsafe manner."[42] However, the Fifth Circuit in *Wheeler v. Norfolk Southern Railway Company* explained stop work authority is "a far cry from the directive control" required by its

---

[40] Baker v. Tex. & Pac. Ry. Co., 359 U.S. 227, 228–29 (1959).
[41] *Wheeler*, 2022 WL 2909528, at *16 (quoting Morris v. Gulf Coast Rail Grp., Inc., 829 F. Supp. 2d 418, 429 (6th Cir. 2010)).
[42] Doc 26 at 5; Doc. 26-4 at 11.

9

precedent.[43] Stop work authority is necessary and unsurprising in this context, as it is certainly reasonable for the railroad, in its capacity as property owner, "to be concerned about workers performing potentially hazardous work on its land."[44]

Plaintiff asserts that his case is distinguishable from *Wheeler* on the basis that he not only retained this authority but has exercised it. However, Plaintiff's exercise of stop work authority remains immaterial to the issue of control because, like in *Wheeler*, Defendant's stop work authority encompasses only the power to tell laborers to stop working, not the power to affirmatively order that certain tasks be done a certain way.[45] Thus, Defendant's exercise of stop work authority "falls short of the affirmative control necessary to allow a finding of substantial supervisory power."[46]

### B. Track Protection

Plaintiff asserts that ICRC's supervision relating to "track protection" alone is sufficient control for this Court to find that Plaintiff was an employee of ICRC.[47] The Court notes that OCCI employees necessarily had to cross existing track to build the new bridge and could not do so without the EIC's permission to cross the tracks. However, this track protection is not affirmative control. This permissive, rather than mandatory, authority is best characterized as "the passing of information and the accommodation that is obviously required in large and necessarily coordinated operation."[48] To continue its rail operations over existing track, Defendant necessarily had to

---

[43] *See Wheeler*, 6 F.4th at 631.
[44] *Id.* at 632 (quoting Campbell v. BNSF Ry. Co., 600 F.3d 667, 674 (6th Cir. 2010)).
[45] *See id.* at 630.
[46] *Id.* at 631.
[47] Doc. 26 at 23.
[48] *See Kelley*, 419 U.S. at 330 (finding that the passing of information and accommodation required in a large and necessarily coordinated operation is insufficient contact to deem the laborers pro hac vice employees of the railroad).

coordinate with crossing construction laborers by providing track protection. Thus, this Court finds that Defendant's track protection falls short of the affirmative control necessary for a finding that Plaintiff was Defendant's employee.

### C. Daily Job Briefings and Risk Assessment Forms

Next, Plaintiff asserts that ICRC's daily job briefings and corresponding Risk Assessment Forms document the extent of Defendant's substantial supervision. Kenny McGowan was the ICRC EIC for most of Plaintiff Hanley's time working on the Spillway Project. The EIC was responsible for leading the job briefings and completing the corresponding forms. During job briefings, employees discussed topics such as the "Life Saving Rule of the Week," "Lessons Learned from Last Shift," and "First Responder and Nearest Hospital Information."[49] Following the meeting, the EIC completed the Job Briefing Risk Assessment Form, outlining the "activities, hazards, and controls of OCCI's specific construction activities."[50] For each activity, the form listed the relevant hazards and appropriate controls to mitigate risks associated with each activity for the day.

The EIC-led job briefings and corresponding forms demonstrate a primary concern for safety rather than a concern for how laborers were completing tasks assigned by OCCI foremen. Plaintiff admittedly characterizes the nature of the job briefings and Risk Assessment Forms as "considerable supervision and oversight to manage the *safe passage of trains while OCCI built the bridge*."[51] These safety-related requirements are unsurprising, as construction activities commenced approximately 50 feet from

---

[49] Doc. 26-5.
[50] Doc. 26 at 19.
[51] *Id.* at 7 (emphasis added).

active railroad tracks.[52] Ray Baker, Vice President of ICRC, testified that these meetings were not to control the work that occurred on the job site.[53] Rather, "after the EIC is done with his briefing [OCCI employees] would go back and they would brief on the means and measures that they were going to use specifically for the tasks that they were going to do."[54] Thus, the Court finds that the daily job briefings and Risk Assessment Forms do not constitute affirmative control as required under FELA, but rather, responses to a reasonable concern about "workers performing potentially hazardous work on [ICRC's] land."[55]

### D. Instructions from Ray Baker, Vice President of ICRC

Finally, Plaintiff asserts that Ray Baker supervised OCCI employees from "menial tasks carried out by OCCI, such as clean-up and debris removal, to OCCI's building of the bridge itself."[56] Plaintiff points to Baker's testimony that Baker addressed with OCCI the:

> number of hammer pile depths, pile lengths, things that Master and Modjeski would find that would need to be repaired, concrete divots, damages to the precast structures as they were carrying them over, things that related to the final product so that the bridge was being constructed per the specifications provided.[57]

These communications do not constitute control. "The mere fact that a railroad reserves the right to assure performance in accordance with the

---

[52] *See Wheeler*, 626 F.4th at 632 (reasoning that requirements that employees "pass a background check, follow . . . safety rules and attend job briefings and safety meetings" is "unsurprising in the context of an independent-contractor relationship").

[53] Doc. 23-3 at 28.

[54] *Id.*

[55] *Wheeler*, 626 F.4th at 632 (citing *Campbell*, 600 F.3d at 674).

[56] Doc. 26 at 18–19. *See* Doc. 26-8 at 9–10 (Plaintiff's deposition as to his contact with Baker).

[57] *Id.* at 19. Modjeski & Masters, which Baker referred to as "Master and Modjeski," is the "on-duty construction inspector and engineer which was acting on the [Canadian National]'s behalf." Doc. 23-3 at 60–61.

specifications of [a] contract does not render a contractor a railroad employee."[58] Further, cooperation and consultation in necessarily coordinated operations are insufficient to establish control.[59] Here, Baker communicated with OCCI to ensure compliance with specifications, which does not "make the contractor a mere servant, where the mode and means of performance are within the control of such contractor."[60] The communications demonstrate the necessary coordination during the Spillway Project between ICRC's contractors—OCCI and Modjeski & Masters. Plaintiff does not otherwise offer any evidence that ICRC controlled the "means and methods" of the Spillway Project. Thus, the Court finds that Baker did not exercise control over Plaintiff.

This Court finds that Plaintiff did not create a material issue of fact as to whether Defendant possessed or exercised the requisite level of control over Plaintiff at the time of his injury. Thus, Plaintiff was not an employee of Defendant. Absent employment by a railroad, Plaintiff cannot sustain a claim under FELA, and as such, Plaintiff's claims must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 21st day of September, 2023.

---

[58] *Wheeler*, 2020 WL 5909528, at *7 (citing Sullivan Gen. Elec. Co., 226 F.2d 290, 291 (6th Cir. 1955)), *aff'd, Wheeler*, 6 F.4th 626.

[59] *Kelley*, 419 U.S. at 326–27.

[60] *Sullivan*, 226 F.2d at 291.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE